## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIAN BARGO, on behalf of himself and all others similarly situated, | No. |
| Plaintiff, | *Civil Action* |
| v. | Hon. |
| APPLE, INC., APPLE PAYMENTS INC., GOOGLE LLC, GOOGLE PAYMENT CORP., HIGH 5 ENTERTAINMENT LLC d/b/a "HIGH 5 CASINO", MW SERVICES LTD. d/b/a "WOW VEGAS", SUNFLOWER LTD. d/b/a "CROWNCOINS CASINO", and B-TWO OPERATIONS LTD. d/b/a "McLUCK.COM", | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Plaintiff JULIAN BARGO, residing in Cliffside Park, New Jersey, brings this action on behalf of himself and all other citizens of the State of New Jersey similarly situated (hereafter "New Jersey citizens") against Defendants APPLE, INC., GOOGLE LLC, HIGH 5 ENTERTAINMENT LLC d/b/a "HIGH 5 CASINO", B-TWO OPERATIONS LIMITED d/b/a "McLUCK.COM", SUNFLOWER LIMITED d/b/a "CROWNCOINS CASINO", seeking to enjoin the Defendants' illegal online casino operation and to recover money lost to illegal gambling pursuant to N.J.S.A. 2A:40-1.

### INTRODUCTION

1.    This case is about patently illegal gambling software being distributed to the cell phones, desktop computers and other personal electronic devices of individuals throughout New Jersey and beyond, by an unlawful enterprise that includes two of the most successful corporations in the world.

2.     Defendants HIGH 5 ENTERTAINMENT LLC ("HIGH 5"), MW SERVICES LTD., B-TWO OPERATIONS LTD. ("B-TWO"), and SUNFLOWER LTD. (collectively, the "Gaming Defendants"), along with others similarly situated, are developers and operators of websites and digital software applications ("apps") that resemble the customary games of chance (blackjack, poker, roulette, *etc.*) typically found in a traditional brick-and-mortar casinos.

3.     The Gaming Defendants misleadingly describe themselves as "social casinos" to promote the deception that their websites and apps are free to play purely for entertainment purposes only. In reality, the Gaming Defendants throw a wild card into the deck: They simultaneously promote sweepstakes awards that effectively transform their supposedly free "social casino" apps and websites into an unauthorized, and unlawful, interstate gambling enterprise, in all but name.

4.     The Gaming Defendants operate a slew of websites and apps with fanciful names that evoke casino enterprises, like "High 5 Casino" (Defendant HIGH 5), "McLuck" (Defendant B-TWO), "Wow Vegas" (Defendant MW SERVICES) and "CrownCoins Casino" (Defendant SUNFLOWER).  The Gaming Defendants offer a multitude of digital slot machines, blackjack, poker, roulette and other forms of lottery wheel.

5.     Besides the websites operated by the Gaming Defendants themselves, their games are available through apps that can be downloaded from the well-known software application platforms owned and operated by Defendants APPLE (the "App Store") and GOOGLE (the "Play Store") to any personal electronic device running on either company's respective operating system.

6.     The Gaming Defendants have engaged in a substantially similar, if not identical, pattern of fraud and misconduct. They entice individuals, such as the Plaintiff and other members of the proposed class, to their websites and apps by fraudulently representing that they provide

free games of chance designed purely for fun and entertainment. *Plaintiffs have discovered—but only after each losing thousands of dollars—that the Gaming Defendants' social casinos are in fact real casinos, where real money can be wagered and lost in exchange for the chance to win an arbitrary financial reward.*

7.      Players either sign up on the websites operated by the Gaming Defendants, or, more commonly, download to their iOS and Android devices (*i.e.*, cell phones, tablets and other personal electronic devices) a corresponding app designed by the Gaming Defendants from either the App Store or Play Store, respectively. After the player agrees to the terms and conditions—which include a plethora of hold harmless clauses and an ironclad arbitration agreement—the Gaming Defendants sell to the player, in exchange for real money, virtual utility tokens that can be used to wager on the digital games of chance described at ¶ 2, *supra*.

8.      But the scheme does not end there. While the utility tokens sold by the Gaming Defendants have no value outside the platform itself, and are primarily used only to play the digital games of chance, *the Gaming Defendants simultaneously throw in a second class of virtual tokens that qualifies the user for sweepstakes prizes. These coins are ultimately redeemable for real value, like cash, gift cards, cryptocurrency (including Bitcoin), etc.*

9.      In sum, the websites and apps owned and operated by the Gaming Defendants allow users to purchase virtual coins, typically called "Game Coins", "Gold Coins" or the like, that can be used to play in their digital casinos; and in return for playing, the Gaming Defendants distribute a secondary class of virtual currency, typically called "Sweeps Coins", "Sweepstakes Coins" or the like, that offer users the prospect of an arbitrary financial windfall, *just like a traditional brick-and-mortar casino*.

10.     The Gaming Defendants have succeeded in misleading regulators about the true

nature of their operations for far too long. These Defendants are *not* licensed casinos. They are *not* regulated by any casino regulator as a traditional casino would be. No one is looking over anyone's shoulder to ensure that the digital dice aren't loaded. And the Gaming Defendants have, thus far, managed to entirely insulate themselves from civil liability by hiding behind an iron curtain of bizarre arbitration agreements, many of which require arbitration in far flung locales like Malta, the Isle of Man, *etc.*

11.    Defendants APPLE, GOOGLE, APPLE PAYMENTS and GOOGLE PAYMENT CORP. (collectively, the "App Defendants") willingly assist, promote and profit from this illegal scheme by, *inter alia*: (1) offering users access to the apps designed by the Gaming Defendants through APPLE's App Store and GOOGLE's Play Store, thereby helping the Gaming Defendants turn their customer's cell phones, iPads and tablets into illegal gambling devices and/or slot machines, as those terms are defined at N.J.S.A. § 2C:37-1; (2) taking a substantial percentage of consumer purchases of Game Coins, Sweeps Coins and other transactions within the apps distributed by the Gaming Defendants through the App Store or Play Store, respectively; and (3) processing illicit transactions between consumers and the Gaming Defendants using their proprietary payment systems, *viz.*, APPLE PAYMENTS' Apple Pay and GOOGLE PAYMENT's Google Pay; and (4) by using search algorithms within GOOGLE's Chrome browser and APPLE's Safari browser to shepherd unwitting customers to the Gaming Defendants' websites and apps, thereby facilitating the Gaming Defendants' unlawful gambling enterprise.

## PARTIES

12.    Plaintiff JULIAN BARGO is an adult citizen of New Jersey, residing in Bergen County. Plaintiff has lost well over $1,000 to Defendants' illegal online gambling operations.

13.    Defendant APPLE, INC. (hereinafter, "APPLE") is a corporation organized and

existing under the laws of California, with its principal place of business in Cupertino, California. APPLE owns and operates the "App Store," a platform widely available to users of APPLE's iOS devices (*e.g.*, iPhones and iPads) and others, through which they can download and obtain access to the illegal casino websites owned and operated by the GAMING Defendants, thereby turning their phone or other device into an instrument used in the Defendants' illegal gambling scheme. APPLE does business by registered agent within the venue of this District and throughout New Jersey generally.

14.    Defendant APPLE PAYMENTS INC. is a Delaware corporation and licensed money transmitter with its principal place of business in Austin, Texas. APPLE PAYMENTS is a wholly owned subsidiary of Defendant APPLE. APPLE PAYMENTS provides payment processing services to various websites and other digital businesses, primarily through their digital wallet known as the "Apple Wallet" using payment systems known as "Apple Pay" and "Apple Cash". APPLE PAYMENTS processes purchases made by customers who download the Gaming Defendants' apps from APPLE's App Store as well as purchases made within the Gaming Defendants' apps and websites ("in-app purchases"). Upon information and belief, APPLE PAYMENTS collects commissions as high as 30% on purchases using Apple Pay or Apple Cash. APPLE PAYMENTS does business by registered agent within the venue of this District and throughout New Jersey generally.

15.    Defendant GOOGLE LLC (hereinafter, "GOOGLE") is a corporation organized and existing under the laws of California, with its principal place of business in Mountain View, California. GOOGLE owns and operates the "Play Store", a platform widely available to users of GOOGLE's Android phones and others, through which they can download and obtain access to the illegal casino websites owned and operated by the GAMING Defendants, thereby turning their

phone or other device into an instrument used in the Defendants' illegal gambling scheme. GOOGLE does business by registered agent within the venue of this District and throughout New Jersey generally.

16.    Defendant GOOGLE PAYMENT CORP. is a Delaware corporation and licensed money transmitter with its principal place of business in Mountain View, California. GOOGLE PAYMENT is a subsidiary of Defendant GOOGLE and therefore owned by Alphabet, Inc. GOOGLE PAYMENT provides payment processing services to various websites and other digital businesses, primarily through a digital wallet and payment system known as "Google Pay" (a/k/a "GPay"). GOOGLE PAYMENT processes purchases made by customers who download the Gaming Defendants' apps from GOOGLE's Play Store as well as in-app purchases made within the Gaming Defendants' apps and websites. Upon information and belief, GOOGLE PAYMENT collects commissions as high as 30% on purchases using GPay. GOOGLE PAYMENT does business by registered agent within the venue of this District and throughout New Jersey generally.

17.    Defendant HIGH 5 ENTERTAINMENT, LLC ("HIGH 5") is a New Jersey limited liability company that owns and operates an internet gambling website (*available at* https://high5casino.com), along with an app and YouTube channel, under the brand "High 5 Casino".  HIGH 5 actively operates and promotes its internet gambling website and app within the venue of this District and throughout New Jersey generally, which website, app and affiliated operations are not permitted and are illegal under New Jersey law.

18.    Defendant MW SERVICES LTD. is a company formed in Gibraltar that owns and operates a gambling website (*available at* https://www.wowvegas.com/) and app under the brand "Wow Vegas". MW SERVICES conducts business within the venue of this District and throughout New Jersey generally, which website, apps and operations are not permitted and are illegal under

New Jersey law.

19.    Defendant SUNFLOWER LTD. is a company of unknown origin with a business address in Arlington, Virginia.  SUNFLOWER owns and operates an internet gambling website (*available at* https://crowncoins.com), along with an app and YouTube channel, under the brand "CrownCoins Casino." SUNFLOWER actively operates and promotes its internet gambling website and app within the venue of this District and throughout New Jersey generally, which websites and operations are not permitted and are illegal under New Jersey law.

20.    Defendant B-TWO OPERATIONS LTD. (hereinafter, "B-TWO") is a company formed in the Isle of Man.  B-TWO conducts business within the venue of this District and throughout New Jersey generally, which websites and operations are not permitted and are illegal under New Jersey law.

## JURISDICTION AND VENUE

21.    Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from any of the Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

22.    This Court has personal jurisdiction over the Defendants because each of the Defendants conducts significant business in this federal district and throughout New Jersey, and because the wrongful conduct alleged by the Plaintiff occurred here in this federal district.

23.    Venue is proper in this federal district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this federal district and because the Defendants committed the acts that are the basis for this lawsuit within this federal

district.

## **FACTUAL ALLEGATIONS**

### **I. The 'Sweepstakes Casino' Model**

24.    The Gaming Defendants actively promote and operate internet gambling websites and downloadable apps that target citizens of New Jersey and elsewhere, thereby conducting business within the venue of this District and throughout New Jersey generally.

25.    The Gaming Defendants entice individuals like the Plaintiff and proposed class members to play their websites and downloadable apps by issuing a bundle of virtual utility tokens, typically called "Game Coins" or the like, that can be used to play their digital games of chance ostensibly for fun and entertainment. After the customers inevitably lose their initial allotment of 'free' Game Coins, they are prompted to purchase more if they wish to continue playing the Defendants' games.

26.    As the user continues playing, the Gaming Defendants also provide an allotment of *sweepstakes* tokens, typically called "Sweeps Coins", "Sweepstakes Coins" or something similar.[1] *Players continue wagering on the Defendants' games of chance in the hopes of winning enough Sweeps Coins to redeem them for valuable prizes like cash, gift cards, or cryptocurrency (including Bitcoin),* inter alia*.*

27.    *In short, what begins as a straightforward "pay to play" social casino quickly morphs into an illicit gambling site, where users are paying real money to play games of chance in the hopes of winning an arbitrary financial windfall. The sale of Game Coins is simply a pretext*

---

[1] High 5 Casino (Defendant HIGH 5) refers to their utility tokens as *Game Coins* and their sweepstakes tokens as *Sweeps Coins*.  CrownCoins Casino (Defendant SUNFLOWER) uses the monikers *Crown Coins* and *Sweeps Coins*, respectively.  Wow Vegas (Defendant MW SERVICES) uses *Wow Coins* and *Sweep Coins*, respectively.  McLuck.com (Defendant B-TWO) refers to them as *Gold Coins* and *Sweepstakes Coins*, respectively.  These are just a sample of the various denominations used by sweepstakes casino websites.

*to entice users to win Sweeps Coins, in what amounts to an unlawful, unauthorized casino—the exact type of illicit gambling operation prohibited by state and federal law.*

28.     By awarding sweepstakes tokens that have real value, the Gaming Defendants' websites and apps—deceptively marketed to the public as harmless 'social' casinos—are, for all intents and purposes, unlawful Internet casinos operating throughout New Jersey and elsewhere, without any authorization to do so. The only difference between the virtual casinos owned and operated by the Gaming Defendants, and the websites owned and operated by traditional brick-and-mortar casinos, is that the latter are licensed businesses, heavily regulated to ensure that they pay when the player wins and the house loses. The Gaming Defendants are not licensed, not regulated, and as the Plaintiff and other class members have come to learn time and time again, *the Gaming Defendants only pay as, when, and if they choose to do so.*

29.     Notably, while marketing themselves as 'social casinos' for fun and entertainment, the Gaming Defendants go so far as to make false representations about enforcing self-exclusion policies to protect against gambling addiction. But because these Gaming Defendants are not licensed casinos, and are not beholden to any casino regulator—like New Jersey's Casino Control Commission—there is no way to ensure that they will honor any self-exclusion request from an addicted user, or otherwise enforce any of their purported 'self-exclusion' policies.

## II.  The Example of Defendant HIGH 5

30.     Defendant HIGH 5 controls and operates High 5 Casino, with an affiliated app available through both APPLE's App Store and GOOGLE's Play Store. High 5 Casino offers traditional games of chance like blackjack and roulette, along with a plethora of digital slot machines. The user interface on High 5 Casino is largely identical to the games of chance that may

be found in traditional brick-and-mortar casinos (*fig's* 1-2):



**fig. 1**



**fig. 2**

31.     Just like in a real casino, the outcome of HIGH 5's games of chance are purportedly

determined at random. Once a user enters a wager on a particular game (*e.g.*, blackjack or slots),

the website or app being used displays a result determined by the algorithms contained in HIGH 5's software. But the outcome and odds of winning are determined by algorithmic code (known as a "random number generator") devised by Defendant HIGH 5.

32.     The other Gaming Defendants follow the same model as Defendant HIGH 5, with only slight, and ultimately immaterial, variations.

### III.  How the Gaming Defendants Camouflage their Illegal Gambling Racket

33.     Defendant HIGH 5 and the other Gaming Defendants camouflage their illegal gambling operations by promoting a two-tiered system of virtual currency used to play their games. To play the games of chance offered by the Gaming Defendants, users like Plaintiffs choose between wagering what High 5 Casino calls 'Game Coins'—utility tokens that, by themselves, have no value outside the virtual casino—or 'Sweeps Coins', which may in fact be redeemed for real value.

34.     When users like the Plaintiff first sign up, they are awarded an initial allotment of free Game Coins and a smaller number of Sweeps Coins (along with 'Diamonds', another form of non-redeemable utility token unique to High 5 Casino). Users also receive a daily bonus of Sweeps Coins, which they soon discover they can "redeem for real prizes", along with a bonus of Game Coins and Diamonds every four hours to incentivize continuous play (*figs.* 3-4, where 'GC' refers to Game Coins and 'SC' refers to Sweeps Coins):



**fig. 3**



**fig. 4**

35.     Defendant HIGH 5 repeatedly states to the Plaintiffs and other users of its website

that their Sweeps Coins are, in fact, redeemable for cash and other valuable prizes (*figs.* 5-6):

**What can you win on social casinos?**

Our social casino is totally free to play. But, you can gain Sweeps Coins while you play that can be exchanged for amazing prizes.

fig. 5 (*available at* **https://high5casino.com/**)

## Does High 5 Casino award real cash prizes?

Yes, High 5 Casino awards real cash prizes! While the platform focuses on a fun and engaging social casino environment, it also allows players to redeem Sweeps Coins for real cash prizes. When you accumulate enough Sweeps Coins, you have the option to convert them into real-world rewards, which is why our players can't get enough of our amazing games!

The process is designed to be quick and simple. Once you hit the required amount of Sweeps Coins, you can choose to either redeem them for cash prizes through the redeem cashier or exchange your sweepstakes tokens for physical items via Prizeout, a third-party rewards platform. Our players love the flexibility of being able to choose between cash prizes or fun rewards, making High 5 Casino a standout platform social casino gamers.

fig. 6 (*available at* **https://high5casino.com/helpcenter/how-to-redeem-real-cash-prizes/**)

36.     Users typically lose their initial allotment of Game Coins soon after they begin playing.  As with a traditional brick-and-mortar casino, the longer a user plays, the more likely they will "bust" and run out of the Game Coins needed to continue playing—but unlike a properly licensed casino, the Gaming Defendants are not subject to any regulatory oversight as to the odds of winning.

37.     After their initial bankroll of Game Coins is gone, users can either replenish their account by either cashing in a Sweeps Coin, *or by purchasing additional Game Coins in the hope of eventually redeeming their allotment of Sweeps Coins for real value.*

38.     Despite HIGH 5's endless assurances, prominently displayed on their website and elsewhere, that High 5 Casino is "always free", the Defendant offers multiple options to *purchase* packages of Game Coins that include Sweeps Coins thrown in as a bonus (*fig.* 7, *infra*, where again, 'GC' refers to Game Coins and 'SC' refers to Sweeps Coins):



**fig. 7**

39.     Despite the representations alluded to in ¶36, *supra*, Defendant HIGH 5 gladly accepts U.S. dollars in exchange for Game Coins through a variety of payment methods, including, but not limited to, debit cards, credit cards, bank transfers, gift cards and digital wallet transactions (*fig.* 8). Other Gaming Defendants accept payment through proprietary payments systems owned and operated by Defendants GOOGLE PAYMENT CORP. and APPLE PAYMENTS, viz., GPay and Apple Pay, respectively (*fig.* 9-10):



**fig. 8 (High 5 Casino)**

**Apple Pay**

For players using Apple devices, we also offer the option to pay with Apple Pay. This is a fast, secure, and seamless way to purchase Crown Coins directly from your iPhone, iPad, or Mac. With Apple Pay, there's no need to enter your card details manually—simply confirm your purchase using Face ID, Touch ID, or your device passcode.

To use Apple Pay, select it as your payment method at checkout. Make sure Apple Pay is set up on your device and linked to your preferred payment method. Once confirmed, your Crown Coins will be added to your account instantly.

**fig. 9 (CrownCoins Casino)**

**Banking**

- **What payment methods can I use?**
  You can make transactions using Amex, Diners, Mastercard, Visa, Googlepay, Applepay, Skrill and Trustly.

**fig. 10 (Wow Vegas)**

40. Like the other Gaming Defendants, HIGH 5 allows the user to seamlessly toggle between play in either standard mode, using Game Coins, or in sweepstakes mode, using Sweeps Coins. An example of the toggle button between the two modes of play in High 5 Casino appears below, where 'GC' refers to the player's amount of Game Coins and 'SC' refers to the amount of Sweeps Coins (*figs.* 11-12, again, where 'GC' refers to the player's amount of Game Coins and 'SC' refers to the amount of Sweeps Coins ):



**fig. 11**



**fig. 12**

41. Incredibly, High 5 Casino's website includes a helpful reminder,[2] exhorting players to "set a monthly entertainment budget" on their ostensibly free gaming platform, cautionary language that belies Defendant HIGH 5's *ad nauseum* representations that their games are free to play (*fig.* 13):

---

[2] *Available at* https://high5casino.com/blog/smart-budgeting-tips-for-sweepstakes-casinos/.

## SET A MONTHLY ENTERTAINMENT BUDGET

A good first step in budgeting for sweepstakes casinos is setting aside a specific amount each month for entertainment. Consider this an "entertainment budget" — similar to what you might spend on movies or dining out. By designating a specific amount, you're free to enjoy your favorite sweepstakes games without overspending or feeling pressured to make extra purchases. This method not only keeps gameplay in check but also gives you peace of mind knowing you're staying within limits that work for you.

fig. 13

42.     Ultimately, Plaintiff and other users of Defendant HIGH 5's websites and apps (available through both APPLE's App Store and GOOGLE's Play Store) have been lured to wager Game Coins they purchase from the Defendant in the hopes of earning Sweeps Coins that can be redeemed for value.  Playing games of chance on HIGH 5's website, or by downloading HIGH 5's app to a personal electronic device like a cell phone or tablet, satisfies New Jersey's statutory definition of "gambling", and renders the device a "gambling device" or "slot machine" as those terms are defined at N.J.S.A. § 2C:37-1.

**IV.  HIGH 5 and the Gaming Defendants' False Marketing**

43.     The Gaming Defendants—after endless assurances that their games of chance are legal and for entertainment only—use a network of paid influencers and misleading customers testimonials to promote their unlawful scheme.  In addition to its High 5 Casino website and app, Defendant HIGH 5 operates a YouTube Channel, @High5Casino, brazenly promoting the idea that users can win real money by playing their games and winning Sweeps Coins. "YouTube" is an online video platform owned and operated by Defendant GOOGLE.

44.     Advertisements on the High 5 Casino website and YouTube channel include Internet influencers holding over-sized checks to emphasize that users can win big money playing games of chance on High 5 Casino (*fig.* 14):



High 5 Casino Brings Thrilling Wins and Endless Fun for Free!
**fig. 14**

45.     The Gaming Defendants' not-so-subtle marketing campaigns, broadcasting the potential of winning real money on their websites and apps, amount to an astounding admission: Defendant HIGH 5 and other Gaming Defendants are carrying on an illicit gambling enterprise, with the full cooperation of the App Defendants, in violation of the laws of numerous states and federal law against unlawful interstate gambling.

46.     Nevertheless, HIGH 5 and other Gaming Defendants knowingly, willfully, and prominently advertise the falsehood that their sites are operating legally in New Jersey and throughout the United States, a claim abetted by the App Defendants, who facilitate the distribution and promotion of the Gaming Defendants' illicit gambling enterprise.

**V.  The Gaming Defendants' False Promises About Redeeming Sweeps Coins**

47.    Like the other Gaming Defendants, Defendant HIGH 5 promises that Sweeps Coins won on High 5 Casino are redeemable for cash and other valuable prizes. Instead, Plaintiffs and the other members of the class soon discover they've been defrauded.

48.    Internet chat forums like Reddit are rife with tales similar to that of Plaintiff JULIAN BARGO's:  Players who try to cash out their winnings from High 5 Casino and other apps and websites operated by the Gaming Defendants discover, albeit too late, that the redemption process is a classic "bait and switch": *Defendant HIGH 5 and the other Gaming Defendants rarely, if ever, redeem any of the Sweeps Coins for any kind of real value.*

49.    The Gaming Defendants typically reject requests by players to redeem their Sweeps Coins for money or other value, for arbitrary and largely contrived reasons. The tactics used by Defendant HIGH 5 and other Gaming Defendants to prevent users from redeeming their Sweeps Coins reveal that the Gaming Defendants are not just running an illegal, unlicensed casino—*they are also operating a patent fraud.*

50.    Because the Gaming Defendants are operating real casino gambling operations, while not beholden to any of the regulators (like New Jersey's Casino Control Commission) who oversee the operations of traditional casinos, there is no way to ensure that the Gaming Defendants honor any of their promises.

**VI.  Losses to the Plaintiff Class Amount to Hundreds of Millions of Dollars**

51.    The Gaming Defendants' illegal gambling operations have been extremely lucrative for them, while driving many victims of their scheme to financial ruin.

52.    Upon information and belief, there are at least a dozen copycat websites,[3]

_____

[3] Others include Chumba Casino, LuckyLand Slots, Global Poker, Stake.us, Pulsz Casino, Chanced Casino, Funrize Casino, Hello Millions Casino, Punt Casino, Fortune Coins Casino,

suggesting that the losses suffered by the proposed class run into the hundreds of millions of dollars—and a substantial portion of those losses accrue to New Jersey residents, like Plaintiff JULIAN BARGO and the members of the proposed class.

53.    Upon information and belief, Defendant HIGH 5 and the other Gaming Defendants maintain detailed records of every individual player's identity, individualized data about their purchase history, their redemption history, and every single wager they make. HIGH 5 and the other Gaming Defendants therefore maintain sufficient records to calculate and reveal the losses sustained by Plaintiff JULIAN and other members of the proposed class.

**VII.  The Role of the App Defendants**

54.    The promotion and distribution of the Gaming Defendants apps through GOOGLE's Play Store and APPLE's App Store to users of Android and iOS devices, respectively, is crucial to the furtherance of Defendants' illicit, interstate gambling scheme.

55.    GOOGLE and APPLE maintain near absolute control over their respective application platforms. Upon information and belief, the App Defendants each take up to 30% of all revenues generated by app sales through the Play Store and the App Store, including in-app purchases made by a consumer *after* initially downloading the app. Thousands of software developers make applications for Android devices and iOS devices available for download exclusively through GOOGLE's Play Store and APPLE's App Store, respectively.

56.    While most of the apps developed by the Gaming Defendants are free to download, their unsuspecting victims are then lured to make in-app purchases of Game Coins and the like within the app itself, typically using either a credit or debit card. In addition to the revenues described in the foregoing ¶55, the App Defendants take up to 30% of any in-app purchases made

_____

Zula Casino, Moonspin Casino, Jackpota Casino, Scrooge Casino, and more.  This is by no means and exhaustive list.

by a consumer after the initial download to their personal device.

57.     Moreover, the App Defendants compound their participation in the Gaming Defendants' illicit enterprise by offering consumers the option to pay using their proprietary payment processing services, Google Pay (GOOGLE) and Apple Pay (APPLE). Upon information and belief, GOOGLE PAYMENT CORP. and APPLE PAYMENTS take a substantial commission for each purchase of Game Coins or similar tokens using Google Pay or Apple Pay, respectively.

58.     The App Defendants are under a contractual obligation to remit the balance (70%) of the user's payment for apps and in-app purchases to the developers of the software, *viz.*, the Gaming Defendants.  However, payments made by Plaintiffs and others to the Gaming Defendants using Google Pay or Apple Pay are remitted directly to GOOGLE PAYMENT or APPLE PAYMENTS, respectively.

59.     The App Defendants, which include the payment subsidiaries of two of the most valuable tech companies in the world, are thus directly profiting from the Gaming Defendants' illegal interstate gambling enterprise.  Plaintiffs seek to enjoin the App Defendants from further participating in, promoting, or facilitating the Gaming Defendants' unlawful interstate gambling enterprise.

60.     The App Defendants' control over their respective platforms means they can decide which apps are available for download to users of Android and iOS devices. Despite numerous complaints from users and others that should have long ago put GOOGLE and APPLE on notice that the Gaming Defendants are operating as unlicensed, illegal casinos throughout the country, they have failed to exclude the Gaming Defendants from their application platforms or otherwise do anything to restrict access to the Gaming Defendants' software, but are instead knowingly and willfully facilitating its distribution.

61.    In other words, despite knowing that the Gaming Defendants' websites and apps are illegal, the App Defendants continue to maintain a sizable (30%) financial interest by hosting their apps on the GOOGLE's App Store and APPLE's Play Store; using search algorithms to drive customers to the Gaming Defendants apps and websites; and in many instances, processing payments on behalf of the Gaming Defendants.

62.    As such, the App Defendants, along with the Gaming Defendants, are all liable as co-conspirators to an illegal gambling enterprise. Moreover, the Gaming Defendants named herein, are just several of a dozen or more sweepstakes casinos that the App Defendants illegally host on their App Store (APPLE) and Play Store (GOOGLE) and thereby distribute to unwitting consumers.

63.    The App Defendants, for their part, directly participate in an informal association and enterprise of individuals and entities with the explicit purpose of knowingly devising and operating an online gambling scheme to exploit consumers and reap hundreds of millions of dollars in profits (the "Sweepstakes Casino Enterprise").

64.    This ongoing Enterprise necessarily promotes the success of each of its members: the Gaming Defendants need the App Defendants to access consumers, distribute their illegal gambling software, and process payments. The App Defendants, for their part, need developers like the Gaming Defendants to publish and market the misleading and pernicious software applications on their App Store (APPLE) and Play Store (GOOGLE) to distribute the illegal gambling software to generate massive revenue streams for all parties to the Enterprise.

65.    Through this case, Plaintiff and the proposed class members seek to force the App Defendants to stop facilitating and participating in the Sweepstakes Casino Enterprise, and to return to consumers the money they have illegally obtained therefrom.

66.    Plaintiff, on behalf of himself and the proposed class members, brings claims for damages and injunctive relief under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"), and New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-2 et seq. ("CFA").

### FACTS SPECIFIC TO PLAINTIFF JULIAN BARGO

67.    Plaintiff JULIAN BARGO is a natural person and citizen of New Jersey who resides in Bergen County, New Jersey at all times material to this Complaint.

68.    Between June 2024 and October 2024, Plaintiff registered with and used the following sweepstakes casino websites: High 5 Casino (available at https://high5casino.com), a casino website owned and operated by Defendant HIGH 5, which offers the chance to win sweepstakes prizes by accumulating ostensibly redeemable Sweeps Coins as outlined in ¶¶'s 24-50, *supra*; CrownCoins Casino (*available at* https://crowncoinscasino.com), a casino website owned and operated by Defendant SUNFLOWER, which offers the chance to win sweepstakes prizes by accumulating ostensibly redeemable Sweeps Coins, similar to the website operated by Defendant HIGH 5; Wow Vegas (*available at* https://www.wowvegas.com/), a casino website owned and operated by Defendant MW SERVICES, which offers the chance to win sweepstakes prizes by accumulating ostensibly redeemable Sweeps Coins similar to the website operated by Defendant HIGH 5; and McLuck.com (*available at* https://www.mcluck.com/home), a casino website owned and operated by Defendant B-TWO, which offers the chance to win sweepstakes prizes by accumulating ostensibly redeemable Sweeps Coins similar to the website operated by Defendant HIGH 5.

69.    Plaintiff downloaded the apps owned and operated by the Gaming Defendants to his iPhone from APPLE's App Store. Plaintiff purchased Game Coins from the Gaming

Defendants using Apple Pay (owned and operated by Defendant APPLE PAYMENTS) which he then wagered on his iPhone for the chance to earn Sweeps Coins, which the Gaming Defendants represented to him and others as redeemable for value.

70.    Plaintiff has standing to bring this action because Plaintiff was damaged by the illegal gambling enterprise conducted by the Gaming Defendants in conjunction with the App Defendants. Most, if not all, of Plaintiff BARGO's losses were sustained by playing the games of chance operated by the Gaming Defendants as described in ¶68 and distributed and made available to him with the knowing assistance of one or more of the App Defendants.

71.    During the relevant period described in ¶68, Plaintiff lost well over $1,000 playing the unlawful games of chance promoted and operated by the Gaming Defendants named therein, whose scheme is substantially identical to that described in ¶¶24-50 *supra* and who were materially assisted by the App Defendants as described in ¶¶54-64, *supra*.

## CLASS ALLEGATIONS

72.    **Class Definition:**  Plaintiff JULIAN BARGO brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons in the State of New Jersey who purchased and lost money by wagering in any online sweepstakes casino owned and operated by the Gaming Defendants with the assistance and participation of one or more of the App Defendants.

73.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, and any entity in which the Defendants or its parents have a controlling interests and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) Plaintiff's counsel and

Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

74.    **Numerosity:** Upon information and belief, tens of thousands of New Jersey residents fall into the definition of the Class.  Members of the Class can be identified through Defendants' records, discovery, and other third-party sources.

75.    **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class.  Common questions for the Class include, but are not necessarily limited to, the following:

    a.    Whether the games offered by the Gaming Defendants are "gambling" as defined at N.J.S.A. § 2C:37-1(b);

    b.    Whether downloading the apps developed by the Gaming Defendants from a platform controlled by the App Defendants renders the phone, tablet or other personal electronic device to which it is downloaded a "gambling device" or "slot machine" as defined at N.J.S.A. § 2C:37-1(e) and (f), respectively;

    c.    Whether Plaintiff and each member of the Class lost money or anything of value by playing the games of chance developed by the Gaming Defendants and promoted by the App Defendants;

    d.    Whether Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 *et seq.*;

    e.    Whether Defendants have violated the federal RICO Act, 18 U.S.C. § 1962(c);

    f.    Whether the Defendants have been unjustly enriched by their misconduct;

    g.    Alternatively, whether the Gaming Defendants have breached their implied

covenants of good faith and fair dealing with a class of consumers;

h.  Alternatively, whether the Defendants are liable to the Plaintiffs for common law fraud.

76.    **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and the other members of the Class sustained damages arising from the wrongdoing of the Defendants.

77.    **Adequate Representation:**  Plaintiff will fairly and adequately protect the interests of the Class, which is estimated to consist of numerous New Jersey citizens. Plaintiff has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class has lost money playing the games of chance provided by the Gaming Defendants through an app made available to them on the App Store or Play Store controlled by Defendants APPLE and GOOGLE, respectively.  Plaintiff and his counsel intend to vigorously prosecute this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests that are antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

78.    **Policies Generally Applicable to the Class:** This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole.  Defendants' misconduct and malfeasance that Plaintiff challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of Defendants' misconduct and malfeasance hinges on Defendants' conduct with respect to the

Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of the Defendants' liability to Plaintiff and to the other members of the Class are the same.

79.    **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Class certification in this matter will foster economies of time, effort, and expense, and will ensure uniformity of decisions and avoid the danger of inconsistent or contradictory judgments arising from the same or substantially similar sets of facts.

80.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

<u>**FIRST CAUSE OF ACTION**</u>
**Violations of N.J.S.A. 2A:40-1**
**(On behalf of Plaintiff and the Class)**

81.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

82.    Plaintiff, members of the Class, and Defendants are all "persons" as defined by

N.J.S.A. 2A:40-1.

83.    New Jersey's gaming loss recovery statute, N.J.S.A. 2A:40-5, provides as follows:

If any person shall lose any money, goods, chattels or other valuable thing, in violation of section 2A:40-1 of this title [illegal gaming], and shall pay or deliver the same or any part thereof to the winner, or to any person to his use, or to a stakeholder, such person may sue for and recover such money, or the value of such goods, chattels, or other valuable thing, from such winner, or from such depositary, or from such stakeholder, whether the same has been delivered or paid over by such stakeholder or not, in a civil action provided such action is brought within 6 calendar months after payment or delivery.

84.    *Gaming*, as defined at N.J.S.A. 2A:40-1, means "[a]ll wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event."  *Gambling* is separately defined at N.J.S.A. 2C:37-1(b), "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the actor's control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."

85.    N.J.S.A. 2C:37-1(d) defines "something of value" as "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."  The "Game Coins" and "Sweeps Coins" sold by the Gaming Defendants, however denoted by the specific app or website at issue, are "something of value" under N.J.S.A. 2C:37-1(d) because they are "token[s], object[s] or article[s]" sold for use at the Gaming Defendants' online casinos in exchange for real money or property or "any interest therein."

86.    The apps and websites owned and operated by the Gaming Defendants are illegal gambling operations under New Jersey law because they are games at which players wager something of value (virtual Game Coins or similar, bought and paid for with real money) and by

an element of chance (*e.g.*, spinning an online slot machine) are able to obtain Sweeps Coins which can ostensibly be redeemed for real value, such as cash, gift cards, cryptocurrency and other prizes, as well as additional entertainment (for extended gameplay).

87.     The Gaming Defendants are the proprietors for whose benefit the online gambling games are played because Defendant HIGH 5 ENTERTAINMENT operates High 5 Casino and/or knowingly derives profits therefrom; Defendant SUNFLOWER LTD. operates CrownCoins Casino and/or knowingly profits therefrom; B-TWO OPERATIONS LTD. operates Mcluck.com and/or knowingly derives profits therefrom; Defendant MW SERVICES LTD. operates Wow Vegas and/or knowingly derives profits therefrom.

88.     As such, Plaintiff and the Class were lured to an illegal, unlicensed gambling enterprise when they purchased Game Coins to wager at the casino websites and apps owned and operated by the Gaming Defendants.  Plaintiff and each member of the Class staked money, in the form of Game Coins and similar utility tokens purchased with actual U.S. currency, to play Defendants' games of chance (*e.g.*, slot machines, blackjack, roulette, *etc.*) for the chance to win additional things or value (*i.e.*, the opportunity to win Sweeps Coins and similarly denominated sweepstakes tokens, redeemable for cash and other valuable prizes, without additional charge).

89.     The Sweeps Coins that Plaintiff and the Class sought to win by playing the games of chance offered by the Gaming Defendants are "thing[s] of value" under New Jersey law because the Gaming Defendants represent that they can be redeemed for cash, gift cards, cryptocurrency and other valuable prizes.

90.     The casino games offered by the Gaming Defendants each meet the definition of a "[c]ontest of chance," as defined by N.J.S.A. 2C:37-1(a), because they are "any contest, game, pool, gaming scheme or gaming device in which the outcome depends in a material degree upon

an element of chance, notwithstanding that skill of the contestants or some other persons may also be a factor therein."  The Gaming Defendants' games are ostensibly programmed to have outcomes that are determined entirely by chance, using algorithms designed to generate random numbers, so that a contestant's skill does not affect the outcome.

91.    The casino games offered by the Gaming Defendants are not "electronic amusements" or "skill-based attractions" as those terms are used and defined at N.J.S.A. 5:8-101 because their outcomes depend entirely upon chance and not upon the skill of the player, are not offered by a "recognized amusement park" as described under the Carnival-Amusement Rides Safety Act, N.J.S.A. 5:3-31 *et seq.*, and because the casino games offered by the Gaming Defendants are illegal "contest[s] of chance" as defined at N.J.S.A. 2C:37-1(a).

92.    As a direct and proximate result of the Gaming Defendants' operation of their illegal gambling websites and apps, Plaintiff JULIAN BARGO and each member of the Class have lost money wagering at Defendants' games of chance.  Plaintiff JULIAN BARGO, on behalf of himself and the Class, seeks an order: (1) requiring the Gaming Defendants to cease the operation of their gambling apps and websites; (2) requiring the App Defendants to cease the distribution of the Gaming Defendants' unlawful gambling apps and websites; and (3) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable by law.

## SECOND CAUSE OF ACTION
### Violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2
### (On behalf of Plaintiff and the Class)

93.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

94.    New Jersey's Consumer Fraud Act, N.J.S.A. 56:8-1 *et seq.* protects both consumers and competitors by promoting fair business practices in commercial markets for goods and services.

95.     To achieve that goal, the CFA prohibits any person from using "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation . . ."  N.J.S.A. 56:8-2.

96.     The CFA states that "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . may bring an action or assert a counterclaim therefor in any court of competent jurisdiction."  N.J.S.A. 56:8-19.

97.     Plaintiffs have suffered an injury-in-fact and have lost money or property as a result of the unlawful conduct by the Gaming Defendants and the App Defendants.

98.     Defendants have violated N.J.S.A. 56:8-1 *et seq.*, because the casino games owned and operated by the Gaming Defendants and distributed with the knowing, willful participation by the App Defendants, constitute illegal gambling as defined at N.J.S.A. 2C:37-1(b) and as more fully explained above.

99.     Defendants' wrongful conduct occurred in the conduct of trade or commerce—*i.e.*, while Defendants were engaged in the business making computer games and other software applications available to the public.

100.    Defendants' acts and practices were and are injurious to the public interest because Defendants, in the course of their business, continuously advertised to and solicited the general public in New Jersey and throughout the United States to play the unlawful games of chance owned and operated by the Gaming Defendants. This was part of a pattern or generalized course of conduct on the part of the Defendants, and many consumers have been adversely affected by Defendants' conduct acting in concert, and the public is at risk.

101.    The Defendants have profited immensely from the widespread distribution of the

unlawful games of chance owned and operated by the Gaming Defendants, amassing hundreds of millions of dollars from the losers of their games of chance.

102.    As a result of Defendants' conduct, Plaintiff and the Class members suffered economic injury to their business or property in that they lost money wagering on Defendants' unlawful games of chance.

103.    Defendants' unfair or deceptive conduct proximately caused Plaintiffs and the Class members to suffer injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on the Gaming Defendants' unlawful games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

104.    Plaintiff, on his own behalf and on behalf of the Class, seeks to enjoin further violation of the law and to recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
#### 18 U.S.C. § 1962(c) (RICO)
#### Racketeering Activities and Collection of Unlawful Debts
#### (Damages and Injunctive Relief)

105.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

106.    At all times relevant, each of the App Defendants (APPLE,  APPLE PAYMENTS, GOOGLE and GOOGLE PAYMENT CORP.) and each of the Gaming Defendants (HIGH 5 ENTERTAINMENT, MW SERVICES LTD., SUNFLOWER LTD., and B-TWO OPERATIONS LTD.) is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because each is capable of holding, and does hold, "a legal or beneficial interest in property."

107.    Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue, as they were injured in their business and/or property as a result of the

Defendants' wrongful conduct described herein, including, but not limited to, the Gaming Defendants and the App Defendants (1) having unlawfully taken and received money from Plaintiffs and the proposed class; (2) having never provided Plaintiffs and members of the class a fair and objective chance to win—they could only lose by playing the games of chance owned and operated by the Gaming Defendants; and (3) having directly and knowingly profited from, on information and belief, rigged and manipulated digital slot machines, roulette wheels and other games of chance.

108.    § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

109.    18 U.S.C. § 1961(1) defines "racketeering activity" to include (i) "any act ... involving ... gambling ... which is chargeable under State law and punishable by imprisonment for more than one year;" (ii) any act which is indictable under Title 18, § 1084 of the U.S. Code (relating to the transmission of gambling information); and (iii) any act which is indictable under Title 18, § 1955 of the U.S. Code (relating to the prohibition of illegal gambling businesses).

110.    Because promoting gambling as defined at N.J.S.A. 2C:37-2 is potentially indictable under New Jersey law, and punishable by imprisonment for more than one year *per* N.J.S.A. 2C:37-2b(2), and further because illegal gambling is indictable under both § 1084 and § 1955 of Title 18 of the U.S. Code, the Social Enterprise is engaged in "racketeering activity."

111.    18 U.S.C. § 1961(6) defines "unlawful debt" as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof," and "(B) which was incurred in connection with the business of gambling in

violation of the law of the United States, a State or political subdivision thereof."

112.    Because the Sweepstakes Casino Enterprise collects debts incurred from a gambling activity in violation of New Jersey law, described herein, its profits derived from its ownership and maintenance constitute "unlawful debt" as defined in Section 1961(6).

113.    The App Defendants violated 18 U.S.C. § 1962(c) and § 1962(d) by participating in, facilitating, or conducting the affairs of the Sweepstakes Casino Enterprise through a pattern of racketeering activity composed of indictable offenses under N.J.S.A. 2C:37-1 *et seq.*

114.    The affiliation between the App Defendants and the Gaming Defendants constitutes a conspiracy to use an enterprise for the collection of unlawful debt in violation of 18 U.S.C. § 1962(d).

**I. The Sweepstakes Casino Enterprise**

115.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

116.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See, e.g., Boyle v. United States*, 556 U.S. 938, 946 (2009).

117.    The Sweepstakes Casino Enterprise is an association-in-fact composed of the App Defendants (APPLE, APPLE PAYMENTS, GOOGLE, GOOGLE PAYMENT CORP.) and the Gaming Defendants (HIGH 5 ENTERTAINMENT, MW SERVICES LTD., SUNFLOWER LTD., and B-TWO OPERATIONS LTD.) who are engaged in, and whose activities affect, interstate commerce, and which have affected and damaged interstate commercial activity. This

Enterprise exists separately from the otherwise legitimate businesses operations of each individual participant.

118.    The pattern of racketeering activity conducted by the members of the Sweepstakes Casino Enterprise is distinct from the Sweepstakes Casino Enterprise itself, as each act of racketeering is a separate offense committed by an entity while the Sweepstakes Casino Enterprise itself is an association-in-fact of legal entities. The Sweepstakes Casino Enterprise has an informal structure of app developers and platforms with continuing functions or responsibilities.

119.    For nearly a decade, the members of the Sweepstakes Casino Enterprise have collaborated together to target and retain high-spending users in their online gambling scheme throughout the country. The App Defendants, upon information and belief, have mutually agreed to continue their Enterprise through their ongoing collection of unlawful debts, functioning as a cohesive unit with the purpose of gaining illicit gambling profits.

**II. The Structure of the Sweepstakes Casino Enterprise**

120.    The Sweepstakes Casino Enterprise consists of the Gaming Defendants and the App Defendants. Each participant agreed to conduct and carry out the affairs and goals of the Sweepstakes Casino Enterprise:

a.    The Gaming Defendants agreed to conduct the affairs of the Sweepstakes Casino Enterprise by developing, updating and operating illegal online slot machines and other unlawful games of chance: the "gambling devices." The Gaming Defendants operate as the principals, forming the necessary business partnerships with the App Defendants for the successful execution of their unlawful gambling scheme. The Gaming Defendants fundamentally rely on software application platforms provided by the App Defendants to host their games, access consumers, and collect revenue. Having had constructive notice

of the unlawful nature of the Gaming Defendants illegal gambling websites and apps, the App Defendants nevertheless agreed with all Enterprise participants to uphold their roles in the Sweepstakes Casino Enterprise, and to continue functioning as a single unit with the common purpose of facilitating the Gaming Defendants unlawful scheme by distributing their software and collecting unlawful debts from online gambling activity.

b.    The App Defendants agreed to conduct the affairs of the Sweepstakes Casino Enterprise by hosting the virtual social gambling applications, distributing the apps to consumer personal electronic devices and processing in-app transactions in exchange for a share in the gamblers' losses.  Additionally, having had notice of the unlawful nature of the virtual social gambling applications, the App Defendants nevertheless agreed with all participants to uphold their roles in the Sweepstakes Casino Enterprise, and to continue functioning as a single unit with the common purpose of facilitating the Gaming Defendants' unlawful scheme, *viz.*, by distributing their software and collecting unlawful debts from online gambling activity.

121.    At all relevant times, each Sweepstakes Casino Enterprise participant was aware of the conduct of the Sweepstakes Casino Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct through the distribution of the Gaming Defendants' software and through in-app sales.

122.    The persons engaged in the Sweepstakes Casino Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

123.    All members of the Sweepstakes Casino Enterprise coordinate and maintain their respective roles in order to enrich themselves and to further the common interests of the whole.

124.    Each Sweepstakes Casino Enterprise participant participated in the operation and

management of the Sweepstakes Casino Enterprise by directing its affairs as described herein.

125.    The wrongful conduct of the Sweepstakes Casino Enterprise has been and remains part of the Sweepstakes Casino Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiffs' and the Class's property. Without the repeated illegal acts and intentional coordination between all participants, the Sweepstakes Casino Enterprise's scheme would not have succeeded and would not pose a threat to Plaintiffs and the other members of the proposed class into the future.

**III. Pattern of Racketeering Activity**

126.    The affairs of the Sweepstakes Casino Enterprise were conducted in such a way as to form a pattern of racketeering activity. The Sweepstakes Casino Enterprise's general pattern of activity consists of designing and operating illegal, online slot machines and other games of chance and repeatedly violating public policy against gambling by:

    a.   Developing illegal online slot machines and other games of chance and disguising them as innocuous video game entertainment;

    b.   Distributing and operating illegal online slot machines and other games of chance that are, upon information and belief, rigged and manipulated;

    c.   Concealing the scope and deceptive nature of their gambling applications despite knowledge of their predatory design and business model;

    d.   Providing a host platform to house unlicensed gambling activity;

    e.   Injuring the public interest by continuously advertising to and soliciting the general public to play illegal online slot machines and other games of chance;

    f.   Conspiring to uphold the Sweepstakes Casino Enterprise; and

    g.   Unjustly collecting unlawful debts and retaining the profits from their illegal

gambling apps and websites.

127.  The Sweepstakes Casino Enterprise has operated as a continuous unit since at least 2018.

128.  Pursuant to and in furtherance of their fraudulent scheme, the App Defendants committed multiple predicate act violations of New Jersey law as previously alleged herein, including violations of N.J.S.A. 2C:37-2a, *inter alia.*

### FOURTH CAUSE OF ACTION
**RICO § 1962(d)**
**Conspiracy to Engage in Racketeering Activities**
**and Collection of Unlawful Debts**
**(Damages and Injunctive Relief)**

129.  Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

130.  18 U.S.C. § 1962(d) states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

131.  As described throughout, and as described in detail in Plaintiffs' *Third Cause of Action* above, even if they did not direct or manage the affairs of the Sweepstakes Casino Enterprise, the App Defendants conspired to commit predicate acts in violation of § 1962(c), including violations of N.J.S.A. 2C:37-2, *inter alia.*

132.  The App Defendants, APPLE, APPLE PAYMENTS, GOOGLE and GOOGLE PAYMENT CORP. acted at all times knowingly and willfully when agreeing to conduct the activities of the Sweepstakes Casino Enterprise.  The App Defendants agreed to and indeed did participate in the requisite pattern of racketeering activity which constitutes this RICO claim, collected unlawful debts, engaged in racketeering activities, and intentionally acted in furtherance of the conspiracy by conducting the pattern of racketeering and unlawful debt collection as

described above.

133.    At the very latest, the App Defendants had notice of the illegality of the Sweepstakes Casino Enterprise as of 2019. Their continuing participation in the Sweepstakes Casino Enterprise after that date demonstrates their commitment to upholding and operating the structure of the Sweepstakes Casino Enterprise.

134.    As a result of the App Defendants' conduct, Plaintiffs and Members of the Class were deprived of money and property that they would not otherwise have lost.

135.    Under 18 U.S.C. § 1964(c), the Class is entitled to treble their damages, plus interest, costs, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

Plaintiff Julian Bargo, individually and on behalf of all other similarly situated, respectfully requests that this Court enter an Order:

    a.  Certifying this case as a class action on behalf of the proposed class defined at ¶ 72, supra; appointing Plaintiff as representative of the proposed class, and appointing their counsel as class counsel;

    b.  Declaring that Defendants' conduct, as set out above, is unlawful under the New Jersey CFA;

    c.  Declaring that Defendants' conduct, as set out above, constitutes racketeering activities, collection of unlawful debts, and conspiracy to engage in the same;

    d.  Entering judgment against Defendants jointly and severally in the amount of the losses suffered by Plaintiff and the members of the class;

    e.  Enjoining Defendants from continuing the challenged conduct;

    f.  Awarding damages to Plaintiffs and the Class members in an amount to be

determined at trial, including trebling as appropriate;

g.  Awarding restitution to Plaintiffs and the members of the proposed class in an amount to be determined at trial;

h.  Requiring disgorgement of all of Defendants' ill-gotten gains;

i.  Awarding reasonable attorneys' fees and expenses;

j.  Awarding pre- and post- judgment interest, to the extent allowable by law;

k.  Requiring injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the proposed class; and

l.  Awarding such other and further relief as equity and justice require, including all forms of relief provided for under N.J.S.A. 2A:40-1, the New Jersey CFA and federal RICO statute or, in the alternative, as provided for by common law.

## JURY TRIAL DEMANDED

Plaintiffs request a trial by jury of all claims that can be so tried.

## DESIGNATION OF TRIAL COUNSEL

Justin A. Meyers, Esq., is designated as trial counsel for Defendants.

Dated: Nov. 27, 2024                    By: /s/    Justin Meyers
                                            Justin A. Meyers, Esq.

                                        By: /s/    Justin Meyers
                                             G. Martin Meyers, Esq.

                                        LAW OFFICES OF G. MARTIN MEYERS, P.C.
                                        *Attorneys for Plaintiffs*

## <u>CERTIFICATION PURSUANT TO RULE 5.2(a)</u>

I hereby certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Fed. R. Civ. P. 5.2(a).

Dated: Nov. 27, 2024

By: /s/    Justin Meyers
       Justin A. Meyers, Esq.

By: /s/    Gary Meyers
       G. Martin Meyers, Esq.

LAW OFFICES OF G. MARTIN MEYERS, P.C.
*Attorneys for Plaintiffs*